## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JOSIE CHAVEZ,**

        **Plaintiff,**

**vs.**                                                                 **No.  02cv1531 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Chavez') Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 12]**, filed November 25, 2003, and fully briefed on February 10, 2003.  On September 5, 2001, the Commissioner of Social Security issued a final decision denying Chavez' claim for disability insurance benefits.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is not well taken and will be DENIED.

### I.  Factual and Procedural Background

Chavez, now forty-eight years old, filed her application for disability insurance benefits on June 22, 2000, alleging disability since March 16, 1994 (Tr. 90), due to rheumatoid arthritis, depression, and poor vision.  Tr. 17.  Chavez has a high school education and past relevant work as a receptionist, cashier, store clerk, and dining room supervisor.  The Commissioner's Administrative Law Judge (ALJ) found Chavez had to establish disability on or prior to March 31, 1996, the date last insured.  *Id.*  On September 5, 2001, the ALJ denied benefits, finding that

Chavez' impairments were severe "within the meaning of the Regulations but not 'severe' enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." Tr. 18. The ALJ further found Chavez did not have an impairment that significantly prevented her from performing medium work prior to her date last insured. Tr. 20. Therefore, the ALJ found Chavez retained "the residual functional capacity (RFC) to perform medium work activity with moderate limitations in understanding, remembering, and carrying out detailed instructions, and moderation (sic) limitations in attention and concentration." Tr. 21. As to her credibility, the ALJ found Chavez' "testimony of subjective complaints and functional limitations, including pain, was not entirely supported by the evidence as a whole to the disabling degree alleged." Tr. 19. Chavez filed a Request for Review of the decision by the Appeals Council. On October 25, 2002, the Appeals Council denied Chavez' request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Chavez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II. Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.  20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of

impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Chavez makes the following arguments: (1) the ALJ's credibility assessment is not supported by substantial evidence; (2) the ALJ improperly concluded the medical evidence of her mental impairment was inconclusive; (3) the ALJ inappropriately determined she could return to her past relevant work; and (4) the ALJ's finding that she could return to other work is not supported by substantial evidence.  Chavez concedes she was last insured for disability benefits on March 31, 1996, therefore, she must establish she was disabled prior to that date.

**A.  Credibility Determination**

Chavez contends the ALJ's credibility determination is not supported by substantial evidence.  According to Chavez, the "only reasons provided by the ALJ in his decision was allegedly that [she] 'was evasive, inconsistent, non-responsive and repeated [the ALJ's] questions."  Pl's. Mem. Supp. Mot. to Reverse at 8.

"Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence.**"** *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v.*

*Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988).  However, the ALJ's credibility determination

does not require a formalistic factor-by-factor recitation of the evidence.  *Qualls v. Apfel*, 206

F.3d 1368, 1372 (10th Cir. 2000).  The ALJ need only set forth the specific evidence he relies on

in evaluating claimant's credibility.  *Id.*  The ALJ may also consider his personal observations of

the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In his decision, the ALJ found:

The claimant's testimony of subjective complaints and functional limitations, including pain, was not entirely supported by the evidence as a whole to the disabling degree alleged. In this case, the claimant testified that she has had problems with her eyesight all her life and can only read books with large print.  She stated that she has had fibromyalgia since 1998, which affects her back, elbows, and knees.  She can sit and stand 10 minutes, but is unable to walk one block.  She can lift and carry five to 10 pounds, has poor grip because her hands hurt, and cannot lift her arms above the shoulders.  She states that she is unable to do housework, and that her family has to help her.  The claimant testified that she has suffered with depression and anxiety since 1994 or 1995.  She feels sad, gets very nervous, and has memory and concentration problems.  She further stated that she is unable to be around crowds, and has disturbed sleep due to dreams and pain.  In addition, she takes pain medication and Prozac, but experiences no side effects.

Treatment notes dated February 10, 1994 from Valencia Counseling Services, Inc. reveal that the claimant's mood was stable, she was oriented times four, memory was intact, and affect was depressed.  She reported that she was doing better and was not going to see the doctor any longer.  The claimant was assessed with dysthymia.  In March of 1994, she was feeling very depressed as she was experiencing the first anniversary of her father's death and had also received a telephone call from her son stating that he was disowning her (Exhibit 3F/90-92).  On February 8, 1996, her thought-content was organized and goal-directed.  Her mood was depressed, memory was intact, attention was okay, and impulse control was good.  In addition, she had appropriate eye contact, and her attitude was cooperative (Exhibit 3F).

When seen on May 22, 1996, her thought content was organized and goal-directed.  She was oriented times four, memory was intact, and mood was stable.  Attention was okay, frustration tolerance was fair, and impulse control was good.  She had appropriate eye contact, and was cooperative and friendly.  She reported that her depression had lifted since Prozac had taken effect.  A Quarterly Treatment Plan Update Report dated June 6, 1996 indicated that her psychiatric condition and interpersonal relationships had improved. She had a Global Assessment of Functioning Scale of 75, which denotes no more than slight impairment in social and occupational functioning.  On February 21, 1997, she was feeling more optimistic.  She was going out more, and wanted to look into volunteer work. Progress notes dated August 3, 2000 revealed she was doing okay overall.  She still had

ongoing health problems and was on Methotrexate and Prednisone.  She reported some occasional panic attacks, but felt current treatment was fine.  It was noted that her psychiatric condition had improved, but had extreme physical pain and deteriorating medical condition, which exacerbated her depression.  It was also noted that her depression, appetite disturbance, anxiety, and panic attacks were moderately limited.  The claimant's depression, anxiety, and medical problems caused difficulty being around people.  Diagnosis was major depression, recurrent, severe, and global assessment of functioning scale of 55 (Exhibit 3F).

A Psychiatric Review Technique Form dated November 15, 2000 by State Agency medical consultant indicates insufficient evidence regarding the claimant's mental impairment for the period from March 16, 1996 to December 31, 1996 (Exhibit 4F).

\* \* \* \* \* \* \* \* \* \*

While the medical evidence does indicate that the claimant did suffer with some mental impairments prior to December 31, 1996, I find inconsistencies within the medical records. In 1994, she experienced the first anniversary of her father's death, and her son disowned her.  Her depression had lifted since Prozac had taken affect.  Thought content was organized and goal-directed, memory and attention were intact, and attitude was cooperative.  Her psychiatric condition and interpersonal relationships had improved, and she was doing better.  Treatment notes covering the period June 1999 to August 2000 reveal the claimant was doing well.  Her medications were working and experienced no side effects.  She was going on trips, was found to have early rheumatoid arthritis in July of 1999, had various pain, degenerative disc disease of the lumbar spine, and required no producing assistive devices for her medical condition (Exhibit 3F).  On May 20, 2001, her corrected vision was 20/40 on both eyes, which was classified as near normal range (Exhibit 6F).  However, on May 3, 2001, Dr. Baca reported that her mental condition was severely limited prior to December 31, 1996 to the present (Exhibit 7F).  I find his assessment to be absolutely suspicious and unbelievable.  Moreover, his medical report dated July 25, 2001 is also inconsistent with prior treatment records and opinions. Accordingly, I give little evidentiary weight to Dr. Baca's opinion that the claimant's mental condition was severely limited prior to December 31, 1996.  Furthermore, I do not find the claimant's testimony at the hearing totally credible about the period in question. She was evasive, inconsistent, nonresponsive, and repeated my questions.  In addition, the medical evidence indicates that her current medical condition has been much more limited at the hearing versus earlier activity reports, which if believed would indicate that her medical problems began or became worse after December 31, 1996.

After a full review of the record, I find that the claimant currently experiences pain and limitations, however, she did not have an impairment that significantly prevented her from performing medium work activity prior to December 31, 1996, the date last insured.

Tr. 19-20 (emphasis added).  Chavez testified she suffered from debilitating depression, often

experienced nervousness, had difficulty being around crowds, had memory and concentration

problems and had nightmares that affected her sleep.  Tr. 37-38, 45, 48-49, 50-53.  The ALJ found Chavez' allegations were not credible because they were not supported by the record.   The ALJ set forth the specific evidence he relied on in evaluating Chavez' credibility.  Because subjective complaints must be evaluated in light of a claimant's credibility as well as the medical evidence, the Court finds the ALJ's credibility determination was proper and supported by substantial evidence.  Accordingly, the Court will not upset an ALJ's credibility determination where, as here, it is supported by substantial evidence.

**B.  Mental Impairment**

Chavez contends the ALJ improperly concluded the medical evidence of her mental impairment was inconclusive.  Chavez misconstrues the ALJ's decision.  In setting out the evidence he considered, the ALJ noted the Psychiatric Review Technique Form submitted by the agency consultant along with the other evidence.  The ALJ noted, "A Psychiatric Review Technique Form dated November 15, 2000 by State Agency medical consultant indicates insufficient evidence regarding the claimant's mental impairment for the period from March 16, 1996 to December 31, 1996."  Tr. 19.  However, the ALJ concluded, "[w]hile the medical evidence does indicate that the claimant did suffer with some mental impairments prior to December 31, 1996, I find inconsistencies within the medical records."  Tr. 20.  The ALJ set forth the inconsistencies and opined Chavez "did not have an impairment that significantly prevented her from performing work activity prior to December 31, 1996, the date last insured."  *Id.*  The Court notes that the date last insured is March 31, 1996.  The date last insured was amended from December 31, 1996 to March 31, 1996 by Chavez' counsel in a letter dated August 15, 2000.  Tr. 99.

Chavez also argues the ALJ disregarded her treating psychiatrist's opinion that she was disabled during the period in question (prior to March 31, 1996).  On July 25, 2001, Dr. Baca submitted a letter of disability stating:

> Josie Chavez has been followed by me for medication treatment of severe recurrent depression and anxiety since 11-95, and with prior treatment for these same conditions going back at least to 01-94.  At her initial evaluation she reported having had chronic depression problems at various times through most of her life, and I would estimate that it is <u>probable</u> that her symptom severity did meet the impairment level of listing 12.04 and 12.06 for affective disorder and anxiety disorder.

Tr. 358 (emphasis added).  Dr. Baca also completed a Statement of Ability To Do Work-Related Mental Activities on May 3, 2001.  Tr. 355-56.  Dr. Baca specifically noted the assessment was for Chavez' ability to do work-related activities "prior to 12/31/96 to the present."  Tr. 355.  Dr. Baca opined Chavez had moderate to severe limitations in the area of  "understanding and memory," limitations severe enough to preclude any employment in the areas of "sustained concentration and persistence,"  moderate to severe limitations in the area of "social interaction," and moderate to severe limitations in the area of  "adaptation."  Tr. 356.  Dr. Baca opined Chavez " had chronic, recurrent severe depression and anxiety symptoms, prognosis poor for significant improvement."  *Id.*

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is supported by objective medical evidence.  20 C.F.R. § 416.927(d) (1)-(6).  Additionally, the

opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved.  See 20 C.F.R. § 416.927(d)(5).

A treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]."  *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  However, unless good cause is shown to the contrary, the Commissioner must give substantial weight to the testimony of the claimant's treating physician.   If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).  An ALJ may not substitute his own opinion for a medical opinion, see *Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 744 (10th Cir. 1993), nonetheless, if the physician's opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected.  *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir.1987).

In this case, the ALJ found Dr. Baca's opinion that Chavez' "mental condition was severely limited prior to December 31, 1996" and "his July 25, 2001 medical report" were inconsistent with prior treatment records and opinions.  Tr. 20.  Substantial evidence supports this finding.  The relevant medical records indicate the following:

On January 28, 1994, the attending physician at Valencia Counseling Services, Inc. noted Chavez was "now back on Prozac– alright– less depression, no panic attacks, except a few mild ones."  Tr. 260.  Chavez reported that in the past Prozac eliminated her depression.  The physician noted she was on the same dosage as she had been on in the past.  Chavez reported sleeping better, seven to eight hours at night.  Her appetite was OK.  Her energy was good.  The

9

physician noted mild anhedonia, no thoughts of suicide, no homicidal ideation.  The physician

noted Prozac was started in March and "has been the most helpful."  *Id.*  The physician also noted

Chavez was still in counseling.  The physician diagnosed Chavez with dysthymia with some

response to Prozac.  The physician increased her Prozac dosage.

The record indicates Chavez failed to keep several appointments.  Tr. 260.  On November

10, 1994, Chavez failed to show up for her appointment.  Tr. 259.  A mental health care provider

noted "has missed several appts with clinician" and "request that clinician follow-up with client."

*Id.*  On November 30, 1994, Chavez failed to keep her appointment.

On November 2, 1995, Dr. Baca evaluated Chavez, noting she had initially been seen on

January 1994.  Tr. 258.  Chavez reported she had a history of depression on and off most of her

life but was worse secondary to situational factors.  She reported a bad marriage and the death of

her father.  Dr. Baca noted Chavez had been on Prozac with "benefits" but for some reason was

changed to Zoloft which did not help.  Chavez reported stopping the medication "on her own a

few months ago, now with return of previous depression."  *Id.*  Chavez reported symptoms of

sleep disturbance, nightmares, tiredness, weight gain, decreased memory and concentration,

decreased energy, and isolating.  Dr. Baca found Chavez' thoughts were organized and goal-

directed, her posture was normal, her facial expressions were sad, her mood depressed, she was

oriented in all four spheres, her attention was OK, her frustration tolerance was good, her impulse

control was good, her memory was intact, her eye contact was appropriate, and her attitude was

cooperative.  *Id.*  Dr. Baca prescribed Prozac and referred Chavez to counseling.

On December 7, 1995, Chavez returned for her follow-up.  Tr. 257.  Dr. Baca noted, "Rx

f/u, reports benefit on reeval Rx Prozac, notes improvement in sleep, mood, interests, going out

more.  Does feel stress from continuing financial pblms (incl. expense of Rx), also having more recent vision pblms from old retinal detachment– now unable to drive at night secondary deteriorating sight." *Id.*  Dr. Baca diagnosed Chavez with "depression, recurrent– improvement noted on Rx ret eval." *Id.*  Dr. Baca instructed Chavez to return in 3-4 weeks.

On December 21, 1995, Chavez did not keep her appointment.  Tr. 256.

The next visit by Chavez to Valencia Counseling Services, Inc. is on January 2, 1996.  Tr. 255.  The therapist noted, "First visit with cl– depressed as a child– depressed mother, cheerful supportive father who became depressed when he became ill 5 years ago.  Died two years ago.  Middle child– couldn't talk with anyone.  Always felt picked on by mother."  Tr. 255.  The therapist noted Chavez previously had been in a bad marriage but was now in a good relationship.  The therapist also noted Chavez had been on and off Prozac for years and had now been taking it for six weeks.  Chavez reported she had come for counseling to address her anger and depression.  The therapist found Chavez' thought content and speech were organized, her posture was normal/relaxed, her facial expressions were tense and anxious, her mood was depressed, anxious and flat, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her impulse control was fair, her memory was intact, her eye contact was appropriate, and her attitude was cooperative and friendly.  *Id.*

On January 4, 1996, Chavez canceled her appointment.  Tr. 254.

On January 11, 1996, Chavez returned to see Dr. Baca.  Tr. 252.  Dr. Baca noted Chavez "reported continued benefit on Rx Prozac." *Id.*  Dr. Baca noted Chavez had no side effects with Prozac when she took it at night.  Dr. Baca had Chavez complete an application for aid from Lilly Research Laboratory for prescription supply of Prozac.  Dr. Baca diagnosed Chavez with

11

"depression– improved on Rx" and noted he would submit the application for aid to Lilly for a
three month supply of Prozac.  *Id.*  Dr. Baca instructed Chavez to return in four weeks.

On January 16, 1996, Chavez failed to show up for her appointment.  Tr. 253.

On February 8, 1996, Chavez returned for her follow-up with Dr. Baca.  Tr. 250.  Chavez
reported continued benefit with Prozac.  Dr. Baca noted he had not heard from Lilly regarding
Chavez' application to Lilly's Indigent program.  Dr. Baca supplied Chavez with Prozac samples
until he heard from Lilly.  Dr. Baca found Chavez' thought content and speech were organized
and goal-directed, her posture was tense, her mood was depressed but better, she was oriented in
all four spheres, her attention was OK, her frustration tolerance was fair, her memory was intact,
her eye contact was appropriate, and her attitude was cooperative.  *Id.*

On February 14, 1996, Chavez canceled her appointment.  Tr. 249.

On February 27, 1996, Chavez failed to show up for her appointment.  Tr. 248.

On March 7, 1996, Chavez returned to see Dr. Baca.  Tr. 247.  Chavez reported her
depression was better, and that she was back on Prozac.  *Id.*  Dr. Baca noted he would keep
Chavez on Prozac.  Dr. Baca found Chavez' thought content and speech were organized and
goal-directed, her posture was normal, her mood was **euthymic,**[1] she was oriented in all four
spheres, her attention was OK, her frustration tolerance was fair, her impulse control was good,
her memory was intact, her eye contact was appropriate, and her attitude was cooperative.  *Id.*

On May 2, 1996, Dr. Baca noted Chavez "was returning after some weeks– had canceled
last appointment secondary to death in family and did not reschedule.  Has now been off

---

[1]  Euthymic is joyfulness, mental peace and tranquility and moderation of mood, not manic
or depressed.  *Stedman's Medical Dictionary* 606 (26th ed. 1995).

prescription– probably 3-4 weeks and having more problem with depression symptoms." Tr. 246. Dr. Baca stressed the importance of Chavez being consistent with taking her Prozac. Dr. Baca diagnosed Chavez with "depression– off Rx." *Id.* Dr. Baca prescribed Prozac and gave her samples for one week. Dr. Baca instructed Chavez to return the following week to reapply for "Rx assistance." *Id.* Dr. Baca scheduled Chavez for a follow-up with him in 4-5 weeks.

On May 8, 1996, Chavez returned to see her counselor. Tr. 245. Chavez explored several issues (fear of losing her boyfriend, fear of intimacy, sexual abuse as a child) with the counselor. The counselor found Chavez' thought content and speech were organized and goal-directed, her posture was normal/relaxed, her facial expressions were tense, her mood was anxious and appropriate, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her impulse control was good, her memory was intact, her eye contact, was appropriate, her attitude was cooperative and friendly. *Id.*

On May 22, 1996, Chavez returned to see her counselor. Tr. 244. Chavez explored her anger toward men and her mother who she described as critical, negative and judgmental. The counselor noted, "Depression has lifted since Prozac has taken effect." *Id.* The counselor found Chavez' thought content and speech organized and goal-directed, her posture was normal/relaxed, her mood was stable, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her impulse control was good, her memory was intact, her eye contact was appropriate, her attitude was cooperative and friendly. *Id.*

On May 23, 1996, Chavez' counselor completed an Integrated Assessment Summary that she noted was a "rewrite of 2-1-96." Tr. 242. Significantly, the counselor noted, "Has poor eyesight which precludes night driving. Client says she's trying to get SSI because of this. All

jobs she's ever had have demanded driving during dark or early morning or late night." *Id.* As to

her activities of daily living, the counselor noted, "Client appears to feel well provided for by live-

in boyfriend. Has not complained of financial difficulties. Does not appear to want to work." *Id.*

The counselor summarized her conclusions, stating: "Client is intelligent, strong-willed, has good

support system, is willing to look at self." *Id.*

On June 6, 1996, Dr. Baca completed a Quarterly Treatment Plan Update. Tr. 237. Dr.

Baca assigned Chavez a GAS (Global Assessment Scale) of 75.[2] Dr. Baca also noted

improvement in Chavez' psychiatric and interpersonal problems. *Id.* Dr. Baca signed the Plan

Update form on June 6, 1996. Chavez and her therapist signed it on May 30, 1996.

On June 1, 1996, Chavez rescheduled her appointment with her counselor. Tr. 236.

On June 6, 1996, Chavez returned for her follow-up. Tr. 235. Chavez reported her

"depression was OK" and "continues on Rx with benefits. Needs to resubmit application for Rx

assistance." *Id.* Dr. Baca diagnosed Chavez with "Depression–improved with Rx." *Id.* Dr. Baca

found Chavez' thought content/speech organized and goal-oriented, her mood **euthymic** but

worried, she was oriented in all four spheres, her attention was OK, her frustration tolerance was

fair, her memory was intact, her eye contact was appropriate, and her attitude was cooperative.

*Id.* Dr. Baca instructed Chavez to return for a follow-up in one month.

_____

[2] The Global Assessment Scale is a rating scale for evaluating the overall functioning of a
subject during a specified time period on a continuum from psychological or psychiatric sickness
to health. Endicott J, Spitzer RL, Fleiss JL, Cohen J: "The Global Assessment Scale: A
Procedure for Measuring Overall Severity of Psychiatric Disturbance." *Archives of General
Psychiatry* 33:766-771, 1976. A rating of 75 indicates "minimal symptoms may be present but
no more than slight impairment in functioning, varying degrees of 'everyday' worries and
problems that sometimes get out of hand." *Id.*

In July, Chavez saw her counselor.  Tr. 233.  Chavez was having problems with a former boyfriend.  The counselor found Chavez' thought content and speech were organized and goal-oriented, her posture was normal, her facial expressions were tense, her mood was worried, she was oriented in all four spheres, her attention was OK, her memory was intact, her eye contact was appropriate, and her attitude was cooperative and friendly.  *Id.*

Chavez returned to see her counselor later in July.  Tr. 232.  Chavez was still having worries regarding the former boyfriend.   The counselor made the same findings as the previous visit except she noted Chavez' mood was anxious.  *Id.*

In August of 1996, Dr. Baca reevaluated Chavez.  Tr. 231.  Chavez reported the Prozac continued to be helpful.  Chavez reported feeling stressed because of difficulties she was having with a former boyfriend.  Dr. Baca found Chavez' thought content and speech were organized and goal-directed, her posture was normal, her facial expressions were tense, her mood was depressed, worried, and anxious, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her memory was intact, her eye contact was appropriate, and her attitude was cooperative.  *Id.*  Dr. Baca instructed Chavez to return in one month.

On September 12, 1996, Chavez returned for her follow-up with Dr. Baca.  Tr. 230.  Chavez reported feeling stressed but also less harassment from former boyfriend.  Chavez also reported she was getting married.  Dr. Baca noted "no problems or complaints."  *Id.*  Dr. Baca diagnosed Chavez with "depression– improvement with Rx."  *Id.*   Dr. Baca noted Chavez need to reapply for prescription assistance and instructed her to return in one month.

Later in September, Chavez returned to see her counselor.  Tr. 229.  Chavez reported having problems with her sixteen year old son.  The counselor found Chavez' thought content and

speech was organized, her posture tense, her mood sad and worried but appropriate, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her impulse control was good, her memory was appropriate, her attitude was cooperative and friendly. *Id.*

On October of 1996, Chavez returned to see Dr. Baca. Tr. 228. Chavez reported she was doing well. Dr. Chavez noted Prozac continued to be helpful without side effects. Chavez also reported her situation was improving. Dr. Baca found Chavez' thought content and speech were organized and goal-directed, her posture was normal, her mood was **euthymic** but worried, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her impulse control was good, her memory was intact, her eye contact was appropriate, and her attitude was cooperative. *Id.* Dr. Baca instructed Chavez to continue with her Prozac and return in one month.

On November of 1996, Chavez returned for her follow-up with Dr. Baca. Tr. 227. Chavez reported doing well. Dr. Baca noted Chavez continued to improve on Prozac. Dr. Baca diagnosed Chavez with "depression– improved on Rx– stable." *Id.* Dr. Baca found Chavez' thought content and speech organized and goal-directed, her posture was normal, her mood **euthymic**, she was oriented in all four spheres, her attention was OK, her frustration tolerance was fair, her memory was intact, her eye contact was appropriate, and her attitude was cooperative. *Id.* Dr. Baca instructed Chavez to return in two months.

On January 9, 1997, Chavez did not keep her appointment with Dr. Baca. Tr. 226.

On January 16, 1997, Chavez returned for her follow-up with Dr. Baca. Tr. 225. Dr. Baca did a medication management assessment on that day. Chavez reported she was feeling

16

more stressed due to her son dropping out of school.  Chavez informed Dr. Baca she planned to

get an appointment for therapy.  Dr. Baca instructed Chavez to return in two months.

On January 24 1997, Chavez met with her counselor.  Tr. 224.  The counselor noted

Chavez was experiencing more stress due to family matters, i.e., her son dropping out of school.

The counselor noted "Cl's tendency to worry is exacerbated by problems about which she feels

victimized.  Some progress toward being proactive."  *Id.*  The counselor scheduled Chavez for

another therapy session.

On February 7, 1997, Chavez returned to see her counselor.  Tr. 223.  Chavez discussed

sending her son to stay with his father and the anger she felt toward her former spouse.  The

counselor noted Chavez was becoming more truthful and seemed ready to address emotional

abuse and anger regarding her former spouse.  The counselor noted rapport was growing.

On February 12, 1997, Chavez' counselor completed and signed a Quarterly Treatment

Review form.  Dr. Baca signed this form on March 16, 1997.  Chavez also signed the form.  Dr.

Baca and the counselor assigned Chavez a GAF[3] score of 75 and a GAS score of 75.

On February 21, 1997, Chavez met with her counselor.  Tr. 219.  Chavez reported having

two "good" weeks.  Her son was now working.  Chavez reported she was "going out more these

---

[3]  Global Assessment of Functioning (GAF score) is a subjective determination which
represents "the clinician's judgment of the individual's overall level of functioning."   American
Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 32 (Text Revision 4th
ed. 2000) (DSM-IV-TR).  The GAF Scale ranges from 100 (superior functioning) to 1 (persistent
danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene,
or serious suicidal act with clear expectation of death.).  DSM-IV-TR at 34.  A GAF score of 75
indicates as follows: If symptoms are present, they are transient and expectable reactions to
psycho-social stressors (e.g., difficulties concentrating after family argument); no more than slight
impairment in social, occupational, or school functioning.  *Id.*

days and expressed her interest in doing volunteer work.  The counselor noted, "Josie appears to be feeling more optimistic about herself and future.  Wants to become less reclusive and has made efforts to do so."  *Id.*

On March 6, 1997, Chavez returned for a follow-up with Dr. Baca.  Tr. 218.  Chavez reported "doing well."  Dr. Baca diagnosed Chavez with "depression– improvement noted with Rx."  *Id.*  Dr. Baca noted Chavez would reapply for prescription assistance on that day.  Dr. Baca also instructed Chavez to return in one month.

On March 14, 1997, Chavez did not keep her appointment with her counselor.  Tr. 217.

On April 3, 1997, Chavez returned for her follow-up with Dr. Baca.  Tr. 213.  Chavez reported feeling more stressed due to a family situation.  Dr. Baca advised Chavez to see her counselor.  Dr. Baca diagnosed Chavez with depression and instructed her to return in two months.

On April 8, 1997, Chavez did not keep her appointment with her counselor.  Tr. 216.

On April 16, 1997, Chavez returned for a counseling session.  Tr. 214.  At that time, Chavez reported feeling more stressed due to possible sex abuse of a grandchild.

On June 12, 1997, Chavez returned for her  follow-up with Dr. Baca.  Tr. 212.  Chavez reported doing well and had no complaints or problems.  Dr. Baca instructed Chavez to return in six weeks.

On August 7, 1997, Chavez returned to see Dr. Baca.  Tr. 211.  Chavez reported doing well and had no complaints or problems.  Dr. Baca assessed Chavez as "doing well."  *Id.*  Dr. Baca instructed Chavez to return in three months.

On August 26, 1997, the counselor completed a Treatment Plan Review form.  Tr. 209. Dr. Baca and the counselor assigned Chavez a GAS score of 75.  Dr. Baca signed this form on September 11, 1997.  Tr. 208.  Chavez did not sign this form.  The counselor noted she seen Chavez only twice since the last review.  The counselor also noted Chavez had just begun to express her feelings about her former spouse.  Significantly, the counselor noted Chavez had reported she was "more freely leaving the house to do errands," etc., and indicated Chavez expressed a desire to do volunteer work at the Battered Families Shelter.  Tr. 209.

On October 2, 1997, Chavez returned to see Dr. Baca.  Tr. 207.  Dr. Baca noted, "Reports doing very well; no complaints."  *Id.*  Dr. Baca prescribed Prozac and instructed Chavez to return in **three** months.

On January 15, 1998, Chavez returned for her follow-up with Dr. Baca.  Tr. 206.  Dr. Baca noted, "Reports continuing to do well; no complaints or problems with prescription."  *Id.* Dr. Baca also noted, "pt had relapse last trial off Rx– pt wants to cont Rx for a while yet."  *Id.* Dr. Baca assessed Chavez as "stable."  *Id.*  Dr. Baca instructed Chavez to return in **four** month.

On June 4, 1998, Chavez canceled her appointment with Dr. Baca.  Tr. 205.

On June 25, 1998, Chavez returned for her follow-up visit with Dr. Baca.  Tr. 204.  Dr. Baca noted, "reports continued good response to rx prozac, no current c/o or problem with rx or at home.  Will continue rx and follow up."  *Id.*  Dr. Baca assessed Chavez as "stable, improved on rx."  *Id.*  Dr. Baca instructed Chavez to return in **four** months.

On October 28, 1998, Chavez returned for her follow-up appointment with Dr. Baca.  Tr. 203.  Dr. Baca noted, "reports doing well, no specific c/o or problems, will continue rx and

provide refills." *Id.*  Dr. Baca assessed Chavez as "stable on rx." *Id.*  Dr. Baca instructed Chavez to return in **four** months.

On February 4, 1999, Chavez returned for her follow-up appointment with Dr. Baca.  Tr. 202.  Dr. Baca noted, " reports doing ok, but notes some incr depression due to worry re son, has been having problems with depression, on rx.  Discuss long term rx use, pt would like to try off rx at next appt if stress in control." *Id.*  Dr. Baca assessed Chavez as "stable on rx, stressed." *Id.*  Dr. Baca instructed Chavez to return in **three** months.

On May 6, 1999, Chavez returned to see Dr. Baca.  Tr. 201.  Chavez reported feeling stressed due to a dental problem and opted to continue on Prozac until her dental problem was resolved.  Dr. Baca assessed Chavez as "stable on rx." *Id.*

On October 21, 1999, Chavez returned to see Dr. Baca.  Tr. 200.  Dr. Baca noted, "reports has been off rx about 3 months, had been having incr physical pblms, Drs initially thought might be prozac reaction, eventually dx rheumatoid arthritis and Sjorgens syndrome.  Is on methotrexate and prednisone, still working to control sxs.  Depression and anxiety much worse off rx, will resume rx, reeval how doing next month." *Id.*  Dr. Baca assessed Chavez as "worse depression/anxiety." *Id.*

On November 11, 1999, Chavez returned to see Dr. Baca.  Tr. 199.  Dr. Baca noted, " reports depression better [after] getting back on rx prozac; no problems with rx, will continue rx." *Id.*  Dr. Baca assessed Chavea as "better on Rx." *Id.*   Dr. Baca instructed Chavez to return for a follow-up visit in **three** months.

On February 10, 2000, Chavez returned to see Dr. Baca.  Tr. 198.  Dr. Baca noted, "pt reports doing ok re rx, needs to be in Abq today re mother in hospital, will renew rx." *Id.*  Dr.

Baca assessed Chavez as "stable on rx." *Id.* Dr. Baca instructed Chavez to return in **three** months.

On April 6, 2000, Chavez returned to see Dr. Baca. Tr. 197. Dr. Baca noted, "pt reports doing ok, has ongoing health problems, but no c/o or problem re rx prozac, has refill still from last rx, will redo now, follow-up in **four** months." *Id.* (emphasis added). Dr. Baca assessed Chavez as "stable on rx." *Id.*

On August 3, 2000, Chavez returned for her follow-up visit with Dr. Baca. Tr. 196. Dr. Baca noted, "pt reports ok overall, ongoing health pblms, currently on methotrexate and prednisone. Notes some occas panic attacks. Feels current rx is fine, will renew rx, note needs to see therapist." *Id.* Dr. Baca assessed Chavez as "stable on rx." *Id.* Dr. Baca instructed Chavez to return in **four** months.

In an undated Treatment Update, Chavez' counselor noted Chavez psychiatric problems had improved and noted "better with meds." Tr. 193. The counselor also noted Chavez' "extreme physical pain and deteriorating medical condition exacerbated depression." *Id.* The counselor opined Chavez' symptoms severely impaired her in the area of "job/school." *Id.* The counselor noted, "Dep/Anx. and med. problems cause difficulty in being around people; difficulty concentrating." *Id.* However, in rating her depression and anxiety on a "Symptoms and Problems" scale, the counselor rated Chavez' depression, anxiety and panic attacks as moderate. *Id.*

On October 31, 2000, Chavez returned to see her counselor. Tr. 190. The counselor assessed Chavez' mood as stable, affect positive and noted Chavez reported her mood vacillated between depression and optimism. The counselor noted Chavez appeared cheerful, hopeful, and

proactive.  The counselor instructed Chavez to return in one month.  The counselor completed a

Treatment Plan on that day and recommended one hour counseling each month for one year

followed by reevaluation.  Tr. 188.  The opined Chavez may need medication indefinitely.

    The evidence provided by Chavez to support her mental impairment for the period from

January 1994 to October 2000, does not support her allegations of a debilitating mental

impairment.  The ALJ properly disregarded Dr. Baca's report and opinion of disability because

they were inconsistent and unsupported by the evidence.  As previously noted, an ALJ must give

"controlling weight to a treating physician's well supported opinion, so long as it is not

inconsistent with other substantial evidence in the record."  *Drapeau,* 255 F.3d at 1213.   In this

case, Dr. Baca's opinion of disability is <u>not supported</u> by the evidence and is inconsistent with his

own treatment records.  Accordingly, the Court finds the ALJ set forth specific legitimate reasons

for disregarding Dr. Baca's opinion of disability.

## C.  Past Relevant Work

    At step four of the sequential evaluation process, a claimant bears the burden of proving

that her medical impairments prevent her from performing work that she has performed in the

past.  *See Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988).  However, in order to

make the ultimate finding that a claimant is not disabled at step four, the ALJ is required by the

agency's rulings to make specific and detailed predicate findings concerning the claimant's

residual functional capacity, the physical and mental demands of the claimant's past jobs, and how

these demands mesh with the claimant's particular exertional and nonexertional limitations.  See

SSR 96-8p, 1996 WL 374184, SSR 82-62, at *4, *see also Winfrey v. Chater*, 92 F.3d 1017,

1023-25 (10th Cir. 1996).

Chavez argues the ALJ failed to inquire about the mental demands of her past relevant work. According to Chavez, "the ALJ inquired as to the exertional capacities of her past jobs, by way of the VE (vocational expert), but did not obtain any information whatsoever as to the specific mental functions required of those occupations." Pl.'s Mem. Supp. Mot. to Reverse at 17. The Court disagrees.

Specifically, the ALJ asked the VE the following:

Q:       I find under the Social Security law that she's a younger person with a high school education. Her past relevant work, would you give me skill and exertional levels with job descriptions, please?

A:       Yes. The cashier, wrapper, the DOT is 211 462018, that 's a light job and semi-skilled with an SVP of three. She was a cashier, stocker. That DOT is 299367014. It's a heavy job, however, the way she said she performed it was medium, she lifted up to 50 pounds. It's a semi-skilled job with an SVP of four. Dining room supervisor. DOT 313131018. It's a medium job, and that's how she said she performed it, and it's semi-skilled with an SVP of four. A receptionist. DOT 237367038, it's a sedentary job and semi-skilled with an SVP of four.

Q:       Okay, now in the first - in any of these hypotheticals use the same vocational profile. You have a person with a high school education with past relevant work. And the first one I'm going to look at Dr. Bakka (sic) [form]. Let's assume the person has the following mental limitations. Insofar as understanding and remembering detailed instructions, there would be a limitation that was moderate to severe. As far as concentration and persistence, and his form says that this includes carrying out detailed instructions, maintaining attention and concentration for extended periods the following activities, working on a schedule, maintaining regular attendance, being punctual, working with customer intolerance. Work in coordination within proximity of others without being distracted. [inaudible] work during a workweek, and assume then that the limitations on all of these, which he has sub-categorized for concentration and persistence, that they're severe enough to preclude any employment. I assume that you'd have to say that it does.

A:       Yes.

Q:       If they had all those limits they would preclude any employment?

A:       She may be able to get a job, but wouldn't be able to maintain employment.

Q:       Okay. The second hypothetical, let's assume that the person is – has the physical exertional capabilities of doing medium work, but the– I'm picking out medium because it looks like that was performed in the past. Mental limitations on understanding and

<u>remembering detailed instructions or carrying out detailed instructions would be moderate.</u>
<u>Attention and concentration moderate limitation</u>.  Could that person do the past relevant
work?

A:      <u>Yes, with moderate restrictions, but I'd reduce the numbers by half</u>.

Q:      Is there other work that such a person could do?

A:      You mean the medium level with moderate–

Q:      And you could also, if you feel you have light jobs you may entertain those,
medium or light.

A:      Okay.  In the medium level I would say a laundry worker.  That's medium,
unskilled job, a DOT of 361685018.  The medium unskilled job there are 162,000 jobs in
the national economy and 1,000 jobs in New Mexico.  Cook helper, it's a medium,
unskilled job, the DOT is 317687010.  There's 3.1 million jobs in the national economy
and 6,000 in New Mexico.  And I would reduce both those by 50 percent due to the
moderate restrictions that you gave.  In the area of one area, with those restrictions, we'd
say laundry folder, laundry spotter.  It's an unskilled, light job.  That DOT is 361684018.
There are 40,500 jobs in the national economy and 1,000 jobs in New Mexico.  Customer
service worker, that's unskilled, light job.  You answer questions and you help people
locate merchandise.  The DOT is 299677010 and there's 4 million 86,000 jobs in the
national economy and 22,000 jobs in New Mexico.

Tr. 55-57 (emphasis added).  It is clear to the Court that the VE considered Chavez' past jobs and

opined she could perform several of her past jobs but the availability would be reduced by 50 %

given her moderate limitations in understanding, remembering, and carrying out detailed

instructions and moderate limitations in attention and concentration.  The VE referred to the DOT

and Chavez' own descriptions of her job duties (Tr. 128-32, 142, 151-52).  The Court finds the

ALJ's finding that Chavez could perform some of her past relevant work is supported by

substantial evidence.  Because the ALJ found Chavez could perform some of her past relevant

work, the Court will not address her last argument regarding the ALJ's finding at step five of the

sequential evaluation process that she could perform other work.

**Conclusion**

  The Court's review of the ALJ's decision, the record, and the applicable law indicates the ALJ's decision adheres to applicable legal standards and is supported by substantial evidence. The ALJ's finding that Chavez "did not have an impairment that significantly prevented her from performing medium work activity prior to [March 31, 1996], the date last insured" is supported by substantial evidence.  Accordingly, the ALJ's decision is affirmed.

  A judgment in accordance with this Memorandum Opinion will be entered.

_____<br>
**DON J. SVET**<br>
**UNITED STATES MAGISTRATE JUDGE**